UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED TECHNOLOGIES CORP.        CIVIL NO.:

     Plaintiff,                  **COMPLAINT**
                              **AND DEMAND FOR JURY TRIAL**

v.

ROLLS-ROYCE PLC.               SEPTEMBER 27, 2010

     Defendant.


## NATURE OF THE CASE

    1.    United Technologies Corporation ("UTC") brings this action pursuant to the Connecticut Unfair Trade Practices Act, the common laws of the State of Connecticut, and the Lanham Act, which prohibit unfair and deceptive conduct by Defendant Rolls-Royce PLC ("Rolls-Royce"), and which provide remedies to UTC and its Pratt & Whitney division (together "UTC/PW"). UTC/PW also brings this action pursuant to the patent laws of the United States for judicial declarations that Rolls-Royce's United States Patent No. 6,071,077 is invalid, unenforceable and not infringed by UTC/PW.

    2.    Rolls-Royce has engaged and continues to engage in unlawful conduct to harm UTC/PW by attempting to thwart UTC/PW from manufacturing fan stages for its groundbreaking, next-generation Geared Turbofan™ engine (the "GTF™ engine", also known as the PW1000G series), and from manufacturing fan stages for the GP7200 engine.

## PARTIES

3.    Rolls-Royce engages in a broad range of businesses, including the manufacture and sale of jet engines and jet engine parts for commercial and military aircraft. Rolls-Royce is organized under the laws of England and Wales. It is headquartered in London, England. Rolls-Royce does business in Connecticut and the rest of the United States and most countries around the world. In particular, Rolls-Royce employees are stationed to work in Connecticut in connection with Rolls-Royce's participation in International Aero Engines ("IAE"), a joint venture between Rolls-Royce and UTC/PW, which is based in East Hartford, Connecticut.

4.    UTC is organized under the laws of the States of Delaware. It is headquartered in Hartford, Connecticut. Pratt & Whitney, which is a wholly-owned division of UTC, designs, manufactures, and supports jet engines and jet engine parts for civil and military aircraft, and is headquartered in East Hartford, Connecticut.

## BACKGROUND

5.    UTC/PW is one of three principal competitors in the market for large commercial jet engines. The other two competitors are Rolls-Royce and General Electric ("GE").

6.    Founded in a vacant factory in Hartford, UTC/PW has been manufacturing engines since 1925. UTC/PW employs thousands of personnel at its facilities in East Hartford, Middletown, and Cheshire, Connecticut. UTC/PW produces engines that power over 40% of the world's passenger aircraft fleet.

7.    UTC/PW has a history of innovation dating back to the 1920s. In the 1940s it invented the "two spool" jet engine concept, which became the dominant architecture for jet engines. In the 1950s it helped launch successful jet-powered commercial air transport through introduction of its JT3D engines for the Boeing 707 airplane and other aircraft. In the 1960s,

UTC/PW helped launch the Boeing 727 and 737 airplanes and other aircraft with the JT8D engine. At the end of that decade, UTC/PW's JT9D engines launched the Boeing 747. UTC/PW continued to improve its engines throughout the 1970s and 1980s and in the 1980s introduced the PW2000 and PW4000 product lines and through IAE introduced the V2500 engine. In the 1990s, UTC/PW also developed the PW4168 engine to power the Airbus A330 airplane and provided the launch engine, the PW4084, for the Boeing 777 airplane.

8.     UTC/PW has continued this tradition of innovation, most recently unveiling its groundbreaking GTF™ engine.

9.     The GTF™ engine was principally developed in East Hartford, Connecticut.

10.     It took decades to develop and mature the technologies necessary for the GTF™ engine.

11.     The GTF™ engine is revolutionary because, through the use of the geared system, the GTF™ engine, among other things, reduces fuel consumption, environmental emissions, and engine noise compared to other engines. It also incorporates advances in aerodynamics, lightweight materials, and other technological improvements.

12.     The GTF™ engine is a breakthrough engine that has already shown tremendous promise to become a leading seller in the aviation industry.

13.     Rolls-Royce does not have an immediate commercial answer to the GTF™ engine.

14.     Rather than compete on the merits of its own engines, Rolls-Royce is attempting to undermine UTC/PW's business through unfair business practices.

15.     Rolls-Royce's plan is to undermine the GTF™ engine and UTC/PW's participation in the GP7200 engine, which is sold by the Engine Alliance (a joint venture

between UTC/PW and GE) and powers the world's largest passenger aircraft (the Airbus A380).

16.    Rolls-Royce is falsely stating that its patent prevents UTC/PW from making the GTF™ and GP7200 engines.  Rolls-Royce is also unlawfully interfering with UTC/PW's existing and prospective contracts and business relationships regarding the GTF™ and GP7200 engines.

17.    As one front in its campaign, Rolls-Royce has resorted to fraud and deceit to obtain a patent.

18.    Rolls-Royce is now attempting to use its fraudulently procured patent to wrongfully attack UTC/PW.

19.    In 1997, Rolls-Royce began the process of attempting to acquire a United States patent relating to one part of a jet engine, called the fan stage.  All turbofan engines have a fan stage, which is a set of fan blades on a rotating hub enclosed in a fan case.  The United States Patent & Trademark Office ("PTO") twice rejected Rolls-Royce's patent application because it did not present a novel, patentable invention.  In response, Rolls-Royce abandoned its fan stage patent application and tried again with a second application.  For a third time, the PTO rejected Rolls-Royce's attempt to get a patent.

20.    Frustrated with its inability to secure a patent, Rolls-Royce changed tactics at the PTO and fabricated a new theory of patentability.  Rolls-Royce engaged in an unlawful calculated plan to deceive and defraud the PTO during the patent application process by hiding from the PTO important and voluminous prior art.

21.    Rolls-Royce's calculated strategy to deceive the PTO was a success.  Based on Rolls-Royce's knowing omission of important prior art, including a design feature of at least

42 of its own engines, and presentation of misleading claim amendments, the PTO was finally

deceived into issuing Rolls-Royce a patent.  After acquiring its patent, Rolls-Royce embarked

on a multi-year campaign – which continues to this day – to wield its fraudulently procured

patent as a weapon against UTC/PW.

22.    In sum, Rolls-Royce's unlawful conduct is part of a calculated plan to harm

UTC/PW and deprive aircraft manufacturers, airlines, and the public of the benefits of

competition and of UTC/PW's groundbreaking technology.  Rolls-Royce's conduct violates

the State of Connecticut's Unfair Trade Practices Act, Connecticut common law, and the

Lanham Act.

## JURISDICTION AND VENUE

23.    The Court has jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1332,

1338(a) and 1367, 15 U.S.C. § 1121, and also under the Declaratory Judgment Act, 28 U.S.C.

§ 2201.

24.    The Court has personal jurisdiction over Rolls-Royce consistent with the Due

Process Clause of the United States Constitution under Connecticut's long-arm statute (Conn.

Gen. Stat. § 52-59b, § 33-929), and/or Federal Rule of Civil Procedure 4(k), and/or the United

States Supreme Court's "*Calder* effects" test for at least the following reasons:

      a.    Rolls-Royce, either itself or through its agents it controls, its subsidiaries and its

         alter egos, is doing business in the United States, this State and this District;

      b.    Rolls-Royce, either itself or through its agents it controls, its subsidiaries and its

         alter egos, has substantial, continuous and systematic contacts with the United

         States, this State and this District, and has purposefully availed itself of the

privilege of conducting business in this State and District, thereby invoking the benefits and protections of the law of the State of Connecticut;

c.  Rolls-Royce, either itself or through its agents it controls, its subsidiaries and its alter egos, conducts business operations in this District through its employees stationed to work in Connecticut in connection with Rolls-Royce's participation in IAE, which has its headquarters in East Hartford, Connecticut;

d.  Rolls-Royce, either itself or through its agents it controls, its subsidiaries and its alter egos, has committed unlawful acts in this District and State in violation of the State of Connecticut's unfair trade practices laws and common laws;

e.  Rolls-Royce, either itself or through its agents it controls, its subsidiaries and its alter egos, has committed and will continue to commit unlawful acts in this District and State in violation of the State of Connecticut's unfair trade practices laws and common laws;

f.  Rolls-Royce, either itself or through its agents it controls, its subsidiaries and its alter egos, has committed and will continue to commit unlawful acts, the effects of which were and are expressly directed at this District and State in violation of the Lanham Act, and the State of Connecticut's Unfair Trade Practices Act and common laws, and Rolls-Royce expected or reasonably should have expected that its unlawful acts would have and do have consequences in this State; and

g.  Rolls-Royce controls the acts of its employees that are based in East Hartford, Connecticut, such that the East Hartford employees' contacts with this District and State may be imputed to Rolls-Royce.

h.   In the alternative, Rolls-Royce is a foreign corporation that is not subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the United States Constitution and laws.

25.   Venue is proper in this district under 28 U.S.C. §1391(b), (c) and (d), for at least the following reasons:

a.   Rolls-Royce is a foreign corporation;

b.   Rolls-Royce transacts business and is found within this District either itself or through its agents it controls, its subsidiaries and its alter egos;

c.   Rolls-Royce employees work in this District in connection with Rolls-Royce's participation in IAE;

d.   UTC/PW is headquartered in this district, and much of the evidence – including most witnesses, large and difficult to transport physical evidence such as jet engines, including fan stages and fan blades, voluminous documents including those created with specific software and computer programs, etc. are located in this District;

e.   The Complaint raises claims governed by the laws of the State of Connecticut;

f.   This District has a strong interest in having the claims and issues raised in this Complaint resolved here.  In fact, this District has a greater local interest in the claims and issues raised in this Complaint than any other District in the United States.  UTC/PW is suffering and will continue to suffer harm in this District as a result of Rolls-Royce's unlawful conduct.  Moreover, the effect of Rolls-Royce's conduct would affect products produced in this District, and thus likewise affect Connecticut employees employed in this District.  The GP7200 engine is

assembled in this District and employees residing in this District also work on the GTF™ engine.

## UTC/PW PATENT

26.   On November 17, 1995, UTC/PW filed application No. 08/559,965, based on the fan blade invention by Spear, Biederman, and Orosa, which issued as U.S. Patent No. 5,642,985 ("the '985 Patent").

27.   UTC/PW's '985 Patent relates to particular features of swept fan blades.

28.   UTC/PW's '985 Patent is notable because it issued over one year before Rolls-Royce filed its continuation-in-part application that lead to its patent regarding certain features of swept fan blades.

## ROLLS-ROYCE'S PATENT

29.   U.S. Patent No. 6,071,077 ("the '077 Patent"), entitled Swept Fan Blade, was issued by the United States Patent and Trademark Office on June 6, 2000 to Paul A. Rowlands. On information and belief, Rolls-Royce is the current owner of the '077 Patent.  Rolls-Royce has alleged that certain UTC/PW engines infringe the '077 Patent.

30.   Rolls-Royce has accused UTC/PW of infringing unidentified claims of the '077 Patent, through UTC/PW, its subsidiaries, and its joint venture in connection with the following engines:  GP7200, GTF, PW 800 series, PW 307A, PW 307B, PW 308, PW 308C, PW 600, PW 610, PW 615, PW 617 and ATFI.

## JET ENGINE TECHNOLOGY

31. The vast majority of today's commercial passenger jet aircraft are powered by turbofan jet engines.

32. Turbofan jet engines include a fan, a compressor, a combustor, and a turbine. All sections of a jet engine work together to provide thrust to propel the aircraft. The fan or fan stage contains fan blades that rotate around a hub. The fan blades function like propellers because they move large quantities of air through the fan stage to provide thrust for the engine.

33. In the summer of 1991, UTC/PW engineers discovered how to improve the stability of a fan blade called the TS35. These efforts led to UTC/PW's invention of an improved fan blade by engineers Spear, Biederman, and Orosa, resulting in the '985 Patent.

34. In addition to its work on fan blades, UTC/PW has invested significant resources to make numerous other innovations that improve the performance, efficiency, and reliability of gas turbine engines to provide its customers engines that reduce fuel consumption, environmental emissions, and engine noise compared to other engines. These innovations include improvements to the compressor, combustor, and turbine sections of the engine including new alloys, high temperature coatings, cooling techniques that permit parts to operate at higher temperatures, combustion techniques, aerodynamic designs, and other technical innovations.

## ROLLS-ROYCE'S UNLAWFUL CONDUCT

**Rolls-Royce's Unlawful Conduct Regarding UTC/PW's GTF™ Engine**

35.   Rolls-Royce has engaged in unlawful conduct to harm UTC/PW and its GTF™ engine.

36.   UTC/PW has developed a groundbreaking engine called the GTF™.  The GTF™ engine, among other things, reduces fuel consumption, environmental emissions, and engine noise compared to other engines.  It also incorporates advances in aerodynamics, lightweight materials, and other technological improvements.

37.   The GTF™ engine is undergoing development and testing and is scheduled to enter service in 2013.

38.   UTC/PW's GTF™ engine is already taking hold in the marketplace.

39.   Mitsubishi Aircraft Corporation considered engine proposals for its next generation regional jet.  Rolls-Royce proposed an engine.  UTC/PW proposed the GTF™ engine.  Mitsubishi selected the GTF™ engine.

40.   Bombardier Inc. considered engine proposals for its CSeries mainline aircraft. Rolls-Royce proposed an engine.  UTC/PW proposed the GTF™ engine.  Bombardier selected the GTF™ engine.

41.   Irkut Corp. considered engine proposals for its MC-21 aircraft family.  Rolls-Royce proposed an engine.  UTC/PW proposed the GTF™ engine.  Irkut selected the GTF™ engine.

42.   Airbus considered engine proposals for its "re-engined" A320 NEO (New Engine Offering) aircraft.  Rolls-Royce proposed an engine.  UTC/PW proposed the GTF™ engine.

Airbus rejected the Rolls-Royce engine. Airbus has indicated the GTF™ engine will be one of the engines offered on the A320 NEO should Airbus proceed with that program.

43. Many other aircraft manufacturers and airlines are interested in and considering the GTF™ engine.

44. Rolls-Royce is envious of UTC/PW's breakthrough GTF™ engine and fears its market potential.

45. Concerned about UTC/PW's success, and as part of its unfair trade campaign against UTC/PW, Rolls-Royce is attempting to use its fraudulently procured patent, as well as false and misleading statements, to harm UTC/PW and prevent it from selling the GTF™ engine and to discourage customers from buying it, aircraft manufacturers from offering it, and companies from partnering on it.

46. For example, on August 25, 2010, UTC/PW held its "last bolt" ceremony for its first GTF™ test engine. This was an important, widely publicized event, as it signified the engine was ready for actual testing – a noteworthy milestone in the development of an engine.

47. The very next day, and in a deliberate attempt to interfere unlawfully with UTC/PW's business, Rolls-Royce filed and served its baseless lawsuit for patent infringement seeking to use its fraudulently obtained and unenforceable patent to enjoin sales and development of the GTF™ engine.

48. In connection with its patent infringement action, on August 26, 2010, Rolls-Royce also issued a false and deceptive press release, which was received and relied upon by press outlets in Connecticut and elsewhere.

49.    In the press release, Rolls-Royce falsely publicized that the GTF™ engine infringes Rolls-Royce's patent: "the fan stages . . . on UTC's PW1000G engine (also known as the Geared Turbofan) infringe the Rolls-Royce patent."

50.    This statement was false and misleading.  For example, at the time that Rolls-Royce made these statements it knew its fraudulently obtained patent was unenforceable and therefore the GTF™ engine did not infringe an enforceable patent.

51.    Rolls-Royce's press release also claimed that "the validity of the Rolls-Royce patent has been upheld in the United States."  This statement was false and misleading.  For example, the statement purports to describe the outcome between a prior patent Interference proceeding between UTC/PW and Rolls-Royce.  But Rolls-Royce knows the limited issue during the previous Interference action was only whether a single proposed patent claim from UTC/PW rendered a representative claim of Rolls-Royce '077 Patent claim obvious.  UTC/PW and Rolls-Royce agreed that UTC/PW would not raise any other invalidity attacks on Rolls-Royce's patent during the Interference.  Rolls-Royce's misleading press release statement falsely conveys to the public that the validity of Rolls-Royce's patent has been established.

52.    These false representations were intended to create confusion, mistake and deception among the public, UTC/PW's current and potential customers, aircraft manufacturers, UTC's current and potential partners in the GTF™ engine, and the trade.  These false representations were intended to divert these constituencies away from the GTF™ engine.  Rolls-Royce made these statements willfully, in bad faith, and with the intent to deceive.

12

**Rolls-Royce's Unlawful Conduct Regarding the GP7200 Engine**

53.   Rolls-Royce has engaged in unlawful conduct to harm UTC/PW in connection with the GP7200 engine.

54.   The Airbus A380 is the largest passenger aircraft in the world, holding approximately 525 people in a three class seating configuration with 49% more floor space than any other passenger aircraft.

55.   Jet engines are customized and certified by regulatory authorities for each specific aircraft type.  Customers who purchase the Airbus A380 aircraft currently have only two engine choices – the GP7200, which is manufactured the Engine Alliance, or the Trent 900, which is manufactured by Rolls-Royce.

56.   As part of its campaign against UTC/PW, Rolls-Royce is attempting to use its fraudulently procured patent and its false and misleading public statements to prevent UTC/PW from making the fan stage for the GP7200 engine, to discourage customers from buying the GP7200 engine from the Engine Alliance, and to interfere with the relationship between UTC/PW and GE.

57.   In its infringement suit, Rolls-Royce seeks to hold UTC/PW directly liable for making, using, offering to sell, selling, or importing the GP7200 engine.  But Rolls-Royce knows full well that the Engine Alliance, not UTC/PW, is the party that makes, uses, offers to sell, sells, and/or imports the GP7200.  That is why in its original complaint Rolls-Royce only accused UTC/PW of making and selling the GP7200 fan stage.  In an effort to harm UTC/PW, Rolls-Royce unjustifiably decided to single out and sue only UTC/PW based on the entire GP7200 engine, knowing that UTC/PW was not the proper party.  Rolls-Royce's strategy and baseless allegation is another example of its unlawful conduct and intent to harm UTC/PW.

58.   In connection with its patent infringement action, on August 26, 2010, Rolls-Royce also issued a false and deceptive press release, which was received and relied upon by press outlets in Connecticut and elsewhere.  In the press release, Rolls-Royce falsely publicized that the GP7200 engine infringes Rolls-Royce's patent: "the fan stages on the Engine Alliance GP7200 engine . . . infringe the Rolls-Royce patent."

59.   This statement was false and misleading.  At the time that Rolls-Royce made these statements it knew its fraudulently obtained patent was unenforceable and therefore the GP7200 engine did not infringe an enforceable patent.

60.   Rolls-Royce's press release also claimed that "the validity of the Rolls-Royce patent has been upheld in the United States."  This statement was false and misleading.  The statement purports to describe the outcome between a prior patent Interference proceeding between UTC/PW and Rolls-Royce.  But Rolls-Royce knows the limited issue during the previous Interference action was only whether a single proposed patent claim from UTC/PW rendered a Rolls-Royce '077 Patent claim obvious.  UTC/PW and Rolls-Royce agreed that UTC/PW would not raise any other invalidity attacks on Rolls-Royce's patent during the Interference.  Rolls-Royce's misleading press release statement falsely conveys to the public that the validity of Rolls-Royce's patent has been established.

61.   These false representations were intended to create confusion, mistake and deception among the public, the Engine Alliance's current and potential customers, GE, and the trade.  These false representations were intended to divert these constituencies away from the GP7200 engine and thereby harm UTC/PW's supply of components to and profit from those engines.

14

62.   Rolls-Royce made these statements willfully, in bad faith, and with the intent to deceive.

**Rolls-Royce Committed Fraud on the U.S. Patent Office and Engaged in Bad Faith Inequitable Conduct and Deception to Obtain the '077 Patent**

63.   On October 9, 1998, Rolls-Royce filed application No. 09/168,968, which issued as the '077 Patent. The application that led to the '077 Patent was a continuation-in-part application of application No. 08/819,269, filed on March 18, 1997, which Rolls-Royce abandoned after it could not convince the patent examiner that its alleged invention was novel.

64.   On November 17, 1995, UTC/PW filed application No. 08/559,965, based on the fan blade invention by Spear, Biederman, and Orosa, which issued as the '985 Patent".

65.   UTC/PW's '985 patent is notable because it issued *before* Rolls-Royce abandoned its first attempt to secure a patent for the Rolls-Royce fan blade design that it planned to use on its Trent 900 engines. In fact, UTC/PW's prior patent contributed to the three PTO rejections of Rolls-Royce's initial patent applications. Rolls-Royce only succeeded in overcoming those PTO rejections when it made intentionally misleading statements combined with omissions of important prior art when it submitted claim amendments to the patent examiner.

66.   As explained more fully below, Rolls-Royce – through at least its inventor Mr. Rowlands – fraudulently and deceptively procured the '077 Patent from the PTO based on deliberate omissions to the PTO during the prosecution of the '077 Patent. On information and belief, others that were substantively involved in the prosecution of the '077 Patent also joined in the fraudulent and deceptive conduct that resulted in the '077 Patent.

67.   After a patent application is filed in the PTO, there is an exchange of correspondence between the patent examiner and the applicant so that the PTO can attempt to

assess the patentability of the invention.  This process is termed the "prosecution" of the patent application.

68.    As part of patent prosecution, applicants are required to submit to the PTO the most relevant prior art of which they are aware.  In view of the prior art cited by the applicant, and any prior art the patent examiner may find, the examiner determines whether any of the prior art references anticipate any claims under 35 U.S.C. § 102 (*i.e.,* whether any single prior art reference individually discloses every element recited in the claims).  The examiner also determines whether a reference, or a group of references, would have rendered any claims obvious to persons of ordinary skill in the art at the time the invention was made pursuant to 35 U.S.C. § 103.

69.    After reviewing any relevant prior art, the patent examiner writes a letter to the applicant known as a "Patent Office Action," in which some claims in the application may be initially rejected.  Examiners are duty bound, as best as they can be under the circumstances of their work, to reject applications that do not define non-obvious new subject matter, or otherwise fulfill the requirements of 35 U.S.C. §§ 102, 103, 112, and other relevant provisions of Title 35.

70.    The applicant is permitted to argue for allowance of the application with or without amendments to the claims.  The applicant may argue patentability over a reference and may point out perceived distinctions between patent application claims and any references cited.  The applicant also may submit a sworn declaration or affidavit presenting technical data or legal arguments.  The amendments and arguments made by the applicant are typically made in writing.  To facilitate prosecution of the patent, the applicant is permitted to interview the patent examiner and make arguments either by phone or in person.  The agreements made at

such meetings are required to be summarized in writing.  This summary then becomes part of the prosecution history of the patent.

71.   The prosecution of the application continues until the examiner either issues a "Notice of Allowance" allowing all of the uncanceled claims or a "Final Action" rejecting the disclosure or the claims that have not been allowed by the examiner.  Even after the "Final Action," further prosecution of the application may be permitted before the patent officially issues to the applicant.  Following the notice of allowance, a patent-issue fee is due. After that payment, the patent issues and is printed as an official United States patent.

72.   Since at least the mid 1940s, there has been a "duty of candor" imposed on individuals dealing with the PTO through a federal regulation.  If an individual dealing with the PTO (*e.g.*, an inventor, an attorney representing the inventor before the PTO, and/or someone else substantively involved in the preparation or prosecution of a patent application) knows of any "material" prior art or other fact, then such known material information must be promptly and voluntarily disclosed to the patent examiner.  Because prosecution of a patent is done *ex parte*, relevant individuals are required to assist the examiner by disclosing already known information that should be considered by the examiner during substantive examination of a pending application.  37 C.F.R. § 1.56.

73.   Information is material when there is a substantial likelihood that a reasonable patent examiner would consider it important in deciding whether to allow the application to issue as a patent.

74.   The obligation of candor includes a duty not to intentionally misrepresent any material fact to the examiner during argument or otherwise.  With respect to the applicant's knowledge of prior art, one typical way to comply with the duty of candor is to submit a formal

Information Disclosure Statement identifying relevant prior art known to the applicant.  If the prior art is in the form of a prior printed publication or patent, there is also a prescribed form PTO-1449 (now PTO-SB/08a) on which such disclosed documents must be listed.

75.    During the prosecution of Rolls-Royce's patent applications, the patent examiner determined on several occasions that UTC/PW's '985 Patent anticipated Rolls-Royce's proposed claims under 35 U.S.C. §102 and rendered Rolls-Royce's proposed claims obvious under 35 U.S.C. § 103.

76.    For example, in Rolls-Royce's first U.S. application, in an Office Action dated December 1, 1997, the patent examiner rejected Rolls-Royce's claims "as being clearly anticipated" by UTC/PW's '985 Patent.

77.    Rolls-Royce responded to the patent examiner's rejection on March 27, 1998, and argued that its application was not the same or anticipated by the '985 Patent because in the application "the swept angle has a negative value in a third height region between the second intermediate radius and the tip of the blade;" in other words, the tip of the blade is swept forward.  The examiner was not persuaded and on April 9, 1998, the examiner again rejected Rolls-Royce's claims as anticipated by UTC/PW's '985 Patent.

78.    Rolls-Royce never responded to the examiner's April 9, 1998 rejection and instead chose to abandon its initial U.S. patent application.

79.    Rather than responding to the examiner's rejection to its first attempt to get a patent, Rolls-Royce filed a second application (called a "continuation-in-part" application) on October 9, 1998.  During Rolls-Royce's second attempt to acquire a patent, individuals substantively involved in the prosecution of that application engaged in deliberate, deceptive omissions and misrepresentations to convince the patent examiner to grant Rolls-Royce a

patent and to stop the examiner from rejecting Rolls-Royce's patent application in light of UTC/PW's '985 patent.  As explained more specifically below, those individuals included at least Mr. Rowlands (Rolls-Royce's employee inventor), and others substantively involved in the patent prosecution.

80.   On August 18, 1999, in the patent examiner's first Office Action after Rolls-Royce filed its second attempt to get a patent in the form of a continuation application, the examiner again (for a third time) rejected certain Rolls-Royce's claims because they were anticipated by UTC/PW's '985 Patent under 35 U.S.C. § 102 and certain other Rolls-Royce claims because they were obvious under 35 U.S.C. § 103.

81.   This time, unlike its previous attempts to overcome the patent examiner's rejection based on UTC/PW's '985 Patent, Rolls-Royce did not argue that its claims were patentably distinct from UTC/PW's '985 Patent because of the presence of a forward sweep angle at the tip.  Rolls-Royce conceded in the face of the examiner's continued rejections that the leading edge geometry of the fan blade claimed in its application did not make its claimed invention novel and patentable over the '985 patent.

82.   Instead, Rolls-Royce argued only that an additional and different element in its application distinguished it from UTC/PW's '985 patent.  Specifically, Rolls-Royce argued that its application was different from UTC/PW's '985 patent because Rolls-Royce's application disclosed "a fan casing having an inner duct wall which in the region of a fan rotor is convergent in the downstream direction" and where "*each of said swept fan blades having a tip profile which in revolution conforms to the convergent duct wall.*"  Rolls-Royce made this argument in writing to the examiner and submitted it to the PTO on November 12, 1999.

83.    The distinction argument that Rolls-Royce submitted to avoid the examiner's prior concerns was intentionally designed to mislead the patent examiner.  While Rolls-Royce acknowledged that convergent casings themselves had long been used in the art (Rolls-Royce's patent application said that "[a]n angled casing of this kind has long been used by us to avoid complicated aerodynamic interference effects . . ."), Mr. Rowlands for sure, and on information and belief others substantively involved in the prosecution of the application, intentionally failed to inform the patent examiner that convergent casings *with corresponding blade tip profiles* had also long been used in the art for a variety of different aircraft engine and fan blade designs.

84.    For example, those responsible for prosecuting Rolls-Royce's application, including Mr. Rowlands and others, intentionally chose not to inform the patent examiner in Rolls-Royce's November 12, 1999 written submission that Rolls-Royce's own prior art engines had the same fan blade geometry that the patent examiner relied on to reject Rolls-Royce's previous efforts to secure a patent.  They also intentionally chose not to inform the patent examiner in Rolls-Royce's November 12, 1999 written submission that at least 42 of Rolls-Royce's own prior art engines had a convergent fan casing where the fan blades had a tip profile which conformed to the convergent duct wall while the blades were rotating.  As an engineer at Rolls-Royce, Mr. Rowlands was familiar with the Rolls-Royce engines' convergent casing with corresponding blade tip profiles.  On information and belief, others substantively involved in the prosecution of the '077 Patent were also familiar with the Rolls-Royce engine's convergent casing with corresponding blade tip profiles.  By the time of Rolls-Royce's '077 Patent application, the prior Rolls-Royce engines had been in service for years.

20

85.   Mr. Rowlands and others substantively involved in the patent prosecution chose not to cite or disclose Rolls-Royce's own engines to the PTO as prior art because it would eviscerate the latest argument Rolls-Royce had concocted as to why its application disclosed a novel invention over the prior art, including UTC/PW's '985 Patent.  But for Mr. Rowlands' (and other individuals substantively involved in the '077 Patent prosecution's) failure to disclose the prior art engine fan stage to the patent examiner, the examiner would have continued to reject Rolls-Royce's continuation application as obvious and the '077 Patent never would have issued.

86.   Mr. Rowlands for sure, and on information and belief the others responsible for the prosecution of Rolls-Royce's patent application, also concealed many other prior art commercial jet engines and prior art patents of which they were aware – including engines manufactured and sold by Rolls-Royce and patents issued to Rolls-Royce – that had convergent fan casings where the fan blades had a tip profile which conforms to the convergent duct wall while the blades are rotating.

87.   Dozens of prior art Rolls-Royce engines – none of which were disclosed to the examiner – had convergent casings with corresponding blade tip profiles.  Those Rolls-Royce prior art engines include the Tay Series, RB211 Series, V-2500 Series, and Trent Series, as well as other engines.  Likewise, all of UTC/PW's major commercial engines since the 1960s have used convergent casings with corresponding blade tip profiles, including the JT8D Series, JT9D Series, PW 2000 Series, and the PW 4000 Series, all of which were prior art to Rolls-Royce's application but not disclosed to the examiner.  In addition, Rolls-Royce's prior art U.S. Patent No. 5,408,826 (the '826 patent) teaches a convergent casing with corresponding

blade tip profiles and those responsible for prosecuting the '077 Patent failed to disclose the '826 patent to the patent examiner.

88.    The prior art features that Mr. Rowlands and others substantively involved in the patent prosecution failed to disclose to the examiner were well-known features to Rolls-Royce. For example, Mr. Rowlands has provided sworn testimony that convergent fan casings with corresponding blade tip profiles were known within Rolls-Royce prior to the priority date of Rolls-Royce's invention:

"Q.    Okay.  And convergent casings were the norm in 1996 in jet engine design, correct?

A.    Within Rolls-Royce, they would have been the norm, yes.

Q.    And in fact, most civil fan blades in 1996 would be designed with convergent casing lines, correct?

A.    Within Rolls-Royce again, yes.

Q.    And having the blade tip that roughly followed the shape of the inner duct wall or the casing was the norm as well in 1996, correct?

A.    Yes."

89.    On November 19, 1999 (seven days after submitting its deceptive "convergent casing with corresponding blade tip profiles" argument to the PTO), Rolls-Royce met with the patent examiner.  Based on Rolls-Royce's intentionally misleading November 12, 1999 argument and the November 19, 1999 meeting, the examiner suggested that Rolls-Royce's attorney agents "insert the structural limitation such as the inner portion of the casing has a corresponding shape as the convergent tip portion of the blade in order to overcome the previous office action."

90.    Mr. Rowlands for sure, and on information and belief others prosecuting the patent, intentionally and deceptively withheld from the patent examiner that there was

substantial material prior art – including Rolls-Royce's own known prior art engines – that disclosed the very feature the examiner suggested adding to the pending claims (convergent casings with corresponding blade tip profiles).

91.    Rather than disclose the engines and patents of which they were aware, Mr. Rowlands for sure, and on information and belief others substantively involved in prosecuting the patent, misled the patent examiner into believing that the fact that Rolls-Royce's patent application disclosed a convergent casing with corresponding blade tip profiles transformed otherwise unpatentable claims into inventive and novel claims worthy of a patent.

92.    As Mr. Rowlands' testimony reveals, he and others at Rolls-Royce were aware of the fan stage and blade designs of Rolls-Royce's own prior art engines and patents while he was involved in the prosecution of the '077 Patent.  On information and belief, others substantively involved in the prosecution of the '077 Patent were also aware of the fan stage and blade designs of Rolls-Royce's own prior art engines and patents as well as the fan stage and blade designs of UTC/PW's prior art engines.

93.    Neither Mr. Rowlands nor anyone else substantively involved in the prosecution of the '077 Patent, ever cited any of the prior art identified above to the patent examiner during the prosecution of its applications that led to the '077 Patent.

94.    Mr. Rowlands and others substantively involved in the patent prosecution failed to provide the abundant prior art available showing convergent casings with corresponding blade tip profiles.  This led the patent examiner to wrongly believe that the addition of a claim element with such a limitation was a non-obvious addition to Rolls-Royce's previously rejected claims that would rescue the claims from further rejection.  Had the examiner known of the concealed prior art that was material because it showed the well-known nature of Rolls-

Royce's proposed claim amendment, he would have continued to reject Rolls-Royce's claims as obvious in light of the prior art as a whole and the '077 Patent would not have issued because it was not valid.

95.    After concealing critical prior art that misled the examiner about the scope and content of the prior art, Mr. Rowlands and those involved in the patent prosecution then capitalized on their intentional omissions to overcome the examiner's rejection with claim amendments that added the obvious prior art design it concealed as an element to its claims. On December 2, 1999, Mr. Rowlands and others substantively involved in the patent prosecution added a new claim limitation to the previously rejected claims.  Specifically, the description of the tip profile of the fan blades was changed in independent claim 1 to read (the deleted language is struck through and the new language is underlined):  "each of said swept fan blades having a tip profile which in revolution ~~conforms~~ is convergent so as to substantially correspond to the convergent duct wall."  Likewise, in the other independent claim in the application, claim 8, the description of the tip profile of the fan blades was changed to read (again, the deleted language is struck through and the new language is underlined):  "a tip profile that ~~extends at an angle relative to the axis of rotation~~ is convergent so as to substantially correspond to the convergent inner duct wall of the fan casing."  These claim amendments were a maneuver designed to affirmatively mislead the examiner.

96.    Mr. Rowlands' and others' intentional concealment of critical prior art from the patent examiner, as well as their misleading claim amendments and arguments to the examiner, amounted to fraudulent conduct, and was also deceptive, unfair and inequitable conduct.

97.    Mr. Rowlands' and others' fraudulent conduct deceived the patent examiner into believing that adding language requiring a convergent casing with corresponding blade tip

profiles made the pending claims inventive, and it succeeded in causing the patent examiner to issue a Notice of Allowance for the '077 Patent on December 30, 1999. Mr. Rowlands for sure, and on information and belief others substantively involved in prosecuting the patent, knew about the aforementioned material prior art, intentionally concealed it from the examiner, and intentionally made related amendments and arguments, all for the purpose of furthering Rolls-Royce's calculated plan to have the '077 Patent issued through deception and fraud.

98.   The aforementioned conduct amounted to the knowing concealment of material prior art from the examiner with an intent to deceive the examiner.

99.   But for this fraudulent conduct, the patent examiner would have used the concealed material prior art to reject Rolls-Royce's proposed amended claims and would have continued rejecting the pending claims as obvious and the PTO would have never issued Rolls-Royce's '077 Patent.

**Rolls-Royce Has Unlawfully Used the Fraudulently Procured '077 Patent to Harm UTC/PW with Objectively and Subjectively Baseless Sham Litigation**

**The Interference Proceeding Between UTC/PW and Rolls-Royce**

100.   As permitted by the PTO's Rules, on June 5, 2001, UTC/PW filed a new patent application ("the '931 application") that was based on its '985 patent specification. UTC/PW's '985 patent pre-dated Rolls-Royce's '077 Patent. UTC/PW's new claims in this application included limitations relating, in part, to the geometry of the outer region of the fan blade.

101.   The patent examiner handling UTC/PW's new patent application concluded that Rolls-Royce's '077 Patent claims were obvious in view of UTC/PW's application claims and thus that  Rolls-Royce's '077 Patent claims defined the same patentable invention as UTC/PW's application claims.

102.  Following the patent examiner's findings, the PTO Board of Patent Appeals and Interferences ("the PTO Board") declared Patent Interference No. 105,195 ("Interference") on December 31, 2003, between UTC/PW's '931 application claims and Rolls-Royce's '077 Patent claims.

103.  During the Interference, Rolls-Royce moved for a judgment that there was no interference-in-fact between UTC/PW's '931 application claims and Rolls-Royce's '077 Patent claims, and UTC/PW filed a preliminary motion to add a claim to its application.  However, the parties stipulated early in the Interference that, "for the sole purpose of simplifying the interference," they would not file any other motions.  The parties' stipulation also provided that the parties "waive[d] no rights" to raise other issues in the future, and it specifically stated that the parties were not waiving "any defense to a possible charge of patent infringement based on any patent involved in the interference."  The PTO Board approved the parties' proposed stipulation in an order dated March 2, 2004.  For this reason, UTC/PW made no allegations in either the Interference or the subsequent District Court action under 35 U.S.C. § 146 (which was limited to the issues in the Interference) regarding Rolls-Royce's fraud and inequitable conduct in obtaining the '077 Patent or the validity of the '077 Patent.  Thus, no judicial or administrative body has ever been informed of or addressed Rolls-Royce's fraud and deception in procuring the '077 Patent.

104.  In the Interference, Rolls-Royce argued that the primary examiner of UTC/PW's competing patent application wrongly held that Rolls-Royce's '077 Patent claims were obvious in view of UTC/PW's '931 application claims.  According to Rolls-Royce, the '077 Patent claims included two limitations absent from the '931 application claims, namely, (a) a

26

convergent fan casing with corresponding blade tip profiles and (b) fan blades having an outer region with a forward sweep angle.

105. The PTO Board rejected Rolls-Royce's arguments on February 2, 2005 and ruled that UTC/PW's representative claim 23 (from the '931 application) rendered Rolls-Royce's representative claim 8 obvious and therefore Rolls-Royce's patent claims were cancelled.

**The District Court Proceeding**

106. On April 1, 2005, Rolls-Royce filed a complaint pursuant to 35 U.S.C. § 146 in the United States District Court for the Eastern District of Virginia, seeking review of the PTO Board's decision. In the § 146 action, as before the PTO Board, Rolls-Royce argued that UTC/PW's '931 application claims were missing two elements that the '077 Patent claims required, namely, (a) a convergent fan casing with corresponding blade tip profiles, and (b) fan blades having an outer region with a forward sweep angle. Rolls-Royce filed its § 146 complaint even though it knew that the reason the '077 Patent issued was because of its fraudulent and misleading conduct during prosecution of the '077 Patent.

107. The district court held a three-day trial on December 12-14, 2005, which was restricted to the limited issues raised during the Interference proceeding. On March 31, 2009, the District Court issued its Memorandum Opinion and Order reversing the Board decision and reinstating Rolls-Royce's '077 Patent. The District Court held that the two inventions (UTC/PW's '931 application and Rolls-Royce's '077 Patent) were patentably distinct because the claims of Rolls-Royce's '077 Patent included an element – requirement of forward sweep at the tip of the fan blades – that was not found in UTC/PW's claim 23 of the '931 patent application.

108.  However, with respect to the second element that Rolls-Royce had argued was missing from UTC/PW's application – a convergent casing with corresponding blade tip profiles – the District Court explained that "it would have been obvious to one of ordinary skill in the art in 1995-96 to have added a convergent casing to the invention of UTC/PW's claim 23." The Court found that the "prior art teaching convergent casings are legion," that "Rolls-Royce has admitted that at the time of the invention, 42 of its engines had convergent casings and corresponding blade tip profiles," and that "[t]he feature was therefore well known and used 'to help reduce . . . aerodynamic interference found on the blades.'" In addition to the prosecution history of the '077 Patent, these findings by the Court further illustrate that the '077 Patent would never have issued but for Rolls-Royce's intentional concealment of prior art and misleading claim amendments related to convergent casings with corresponding blade tip profiles – because convergent casings with corresponding blade tip profiles was the only argument Rolls-Royce made to the examiner to try to render the '077 patent as non-obvious. As a result, although no court has addressed Rolls-Royce's fraud and deception in procuring the '077 Patent, one court did make factual determinations that demonstrate Rolls-Royce's fraud.

109.  Because of the parties' stipulation that the PTO Board proceedings would only include a narrow set of issues that did not encompass claims of fraud, inequitable conduct or deceptive failure to disclose prior art, the parties did not present and the District Court did not analyze or address any claims or evidence related to Rolls-Royce's unlawful conduct as presented in this Complaint or the validity of the patent based on significant prior art beyond claim 23 of UTC/PW's patent application.

110.  The United States Court of Appeals for the Federal Circuit affirmed the District Court's decision on May 5, 2010.

111.  Rolls-Royce cannot argue in this proceeding that convergent casings with corresponding blade tip profiles was a non-obvious feature at the time of its '077 Patent Prosecution.

**Rolls-Royce's Infringement Lawsuit**

112.  On May 5, 2010, Rolls-Royce filed (but did not serve) a baseless lawsuit against UTC/PW for infringing Rolls-Royce's '077 Patent in the United States District Court for the Eastern District of Virginia.  On August 26, 2010, Rolls-Royce filed and served a baseless amended complaint also alleging UTC/PW's infringement of the '077 Patent.  Rolls-Royce accuses the GP7200 and GTF™ engine of infringing the '077 Patent.  UTC/PW is moving to transfer the Virginia case to this Court because there is no personal jurisdiction over UTC/PW in Virginia and this Court is a more convenient and appropriate venue for the parties' dispute over jet engines designed and manufactured in Connecticut.

113.  Rolls-Royce's Virginia lawsuit is a sham designed to unlawfully harm UTC/PW and interfere with its business relationships.  The lawsuit is objectively baseless because no reasonable litigant could expect to succeed in the lawsuit, which seeks to assert an unenforceable patent.  The lawsuit is objectively and subjectively baseless because Rolls-Royce knows it is asserting an unenforceable patent and it is doing so now for the purpose of unlawfully harming UTC/PW and interfering with its business relationships.

114.  During the entire time of the Interference, the § 146 lawsuit, and the appeal, Rolls-Royce knew that it had engaged in deceptive conduct and committed fraud and inequitable conduct in obtaining the '077 Patent.

115.  Rolls-Royce has now been litigating the '077 Patent against UTC/PW for over six years.  During this entire time, Rolls-Royce has known that the '077 Patent issued only because of its fraud and inequitable conduct, and its actions in litigating the '077 Patent against UTC/PW have been taken for the purpose of harming UTC/PW.

116.  UTC/PW has been injured and suffered damages and ascertainable losses throughout this time because of Rolls-Royce's fraud and inequitable conduct that resulted in the issuance of the '077 Patent and the subsequent sham litigation related to the '077 Patent. UTC/PW's injuries, damages and ascertainable losses include, but are not limited to, damage to UTC/PW's goodwill and reputation based on Rolls-Royce's baseless claims, the time and money it expended litigating against Rolls-Royce during the Interference, the § 146 lawsuit in the Eastern District of Virginia, and the appeal to the Federal Circuit, and the time and money it has expended and will expend in defense of Rolls-Royce's patent infringement lawsuit now pending in the Eastern District of Virginia.  In addition, UTC/PW will continue to be damaged though increased marketing expense and lost opportunities during ongoing and future campaigns to secure engine orders because of the unfounded market uncertainty created by Rolls-Royce's public statements and its pending patent infringement lawsuit against UTC/PW and its false and misleading August 26, 2010 press release, including unfounded uncertainty with respect to airlines and aircraft manufacturers that have already entered into agreements relating to the accused engines.

117.  Rolls-Royce's misconduct before the PTO and subsequent multi-year campaign to use the '077 Patent and to make false and misleading public statements to harm UTC/PW, UTC/PW's customers and market competition was and continues to be unlawful.

118.  In addition to its unlawful interference with UTC/PW's participation in the GP7200, Rolls-Royce's unlawful conduct is designed to prevent UTC/PW's GTF™ engine technology from gaining acceptance for use on other large commercial engines, including but not limited to any Boeing re-engined 737, any next-generation single aisle aircraft, and any wide-body aircraft.

119.  Rolls-Royce's conduct with respect to the GTF™ engine and the GP7200 engine is unlawful.  Rolls-Royce has caused and will continue to cause injury to UTC/PW as well as to aircraft manufacturers and airline customers who may not receive the benefit from the technological gains provided by the GTF™ engine, and to UTC/PW partners and employees in Connecticut who would benefit from the success of the GTF™ and GP7200 engines.

## Rolls-Royce's Unlawful Conduct Comprises An Overall Calculated Plan To Harm UTC/PW

120.  Rolls-Royce's unlawful calculated plan goes beyond using its fraudulently and deceptively procured '077 Patent to undermine the GP7200 and GTF™ engines with sham litigation and false and misleading statements.

121.  Rolls-Royce is also attempting to unlawfully enforce its '077 Patent against additional engines, including at least the following:  PW 800 series, PW 307A, PW 307B, PW 308, PW 308C, PW 600, PW 610, PW 615, PW 617 and ATFI gas turbine engines.

122.  Moreover, Rolls-Royce is seeking to harm UTC/PW by holding it liable for engines made, used, and sold by separately incorporated entities.  Rolls-Royce alleges that UTC/PW makes, uses, and sells the GP7200, PW 800 series, PW 307A, PW 307B, PW 308, PW 308C, PW 600, PW 610, PW 615, PW 617 and ATFI gas turbine engines.  But Rolls-Royce knows full well that the GP7200 is made, used, and sold by the Engine Alliance (a

31

separately incorporated entity), not UTC/PW, and that the other engines are made, used, and sold by Pratt & Whitney Canada (another separately incorporated entity), not UTC/PW.

123.  Rolls-Royce's sham litigation, strategy of singling out UTC/PW, and public accusations that UTC/PW infringes based on engines Rolls-Royce knows UTC/PW does not make, use or sell are further examples of Rolls-Royce's unlawful conduct.

124.  Rolls-Royce's calculated plan is not a series of isolated acts that can be segregated and considered separately.  Instead, Rolls-Royce's conduct as a whole comprises a series of inseparable acts that together serve Rolls-Royce's overall unlawful calculated plan. Rolls-Royce's overall calculated plan taken as a whole is designed to harm UTC/PW, UTC/PW's potential and actual customers, UTC/PW's potential and actual partners, the commercial jet engine industry, and the public.

## UTC/PW's Claims

### Count 1 – Violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

125.  UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 163 of the Complaint.

126.  Rolls-Royce is engaged in trade or commerce in Connecticut.

127.  Rolls-Royce's conduct in trade or commerce, as set forth above and below in the incorporated paragraphs, is unfair, deceptive, oppressive, unscrupulous and offends public policy in violation of Conn. Gen. Stat. § 42-110a, et seq.

128.  As set forth in the incorporated paragraphs, Rolls-Royce's conduct has caused and will continue to cause UTC/PW to suffer an ascertainable loss and it threatens to cause substantial injuries to consumers.

129. Rolls-Royce's violation of the Conn. Unfair Trade Practices Act entitles UTC/PW to actual and punitive damages, attorney fees, and equitable relief.

### Count 2 – Tortious Interference with Business Expectancy (Airlines and Aircraft Manufacturers)

130. UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 129 of the Complaint.

131. Business relationships exist between UTC/PW and many airlines and aircraft manufacturers, including Airbus.

132. Rolls-Royce knew of UTC/PW's business relationships.

133. While aware of these business relationships, Rolls-Royce acted intentionally and maliciously, and with no justification, in interfering with UTC/PW's business relationships with these airlines and airline manufacturers, and Rolls-Royce knew that the interference was certain or substantially certain to occur as a result of its actions.

134. Rolls-Royce's interference was tortious and consisted of Rolls-Royce's fraudulent procurement of the '077 Patent and its ensuing use of that fraudulently procured patent by asserting it against UTC/PW and by making false and misleading public statements in an attempt to interfere with the business expectancy between UTC/PW and airlines and manufacturers, including Airbus, that are considering purchasing or offering the GTF™ engine.

135. As a result of Rolls-Royce's intentional and malicious conduct, UTC/PW suffered and continues to suffer an actual loss, including but not limited to loss of goodwill, increased expenses, and lost profits.

**Count 3 – Tortious Interference with Contractual Relations (Aircraft Manufacturers)**

136. UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 129 of the Complaint.

137. A contract exists between UTC/PW and the following aircraft manufacturers: Bombardier, Mitsubishi, and Irkut.

138. Rolls-Royce knew of UTC/PW's contractual relationship with these manufacturers.

139. While aware of the contractual relationship, Rolls-Royce acted intentionally and maliciously, and with no justification, in interfering with UTC/PW's contractual relationship with these manufacturers, and Rolls-Royce knew that the interference was certain or substantially certain to occur as a result of its actions.

140. Rolls-Royce's interference was tortious and consisted of Rolls-Royce's fraudulent procurement of the '077 Patent and its ensuing use of that fraudulently procured patent by asserting it against UTC/PW and by making false and misleading public statements in an attempt to interfere with contractual relations between UTC/PW and aircraft manufacturers.

141. As a result of Rolls-Royce's intentional and malicious conduct, UTC/PW suffered and continues to suffer an actual loss, including but not limited to loss of goodwill, increased expenses and lost profits.

**Count 4 – Tortious Interference with Contractual Relations (GE)**

142. UTC/PW incorporates by reference the allegations contained Paragraphs 1 through 129 of the Complaint.

143. UTC/PW and GE have an ongoing contractual relationship in connection with their Engine Alliance joint venture.

144. Rolls-Royce was aware of that relationship.

145. While aware of the contractual relationship between UTC/PW and GE, Rolls-Royce acted intentionally and maliciously, and with no justification, in interfering with that relationship, and Rolls-Royce knew that the interference was certain or substantially certain to occur as a result of its actions.

146. Rolls-Royce's interference was tortious and consisted of Rolls-Royce's fraudulent procurement of the '077 Patent and its ensuing use of that fraudulently procured patent by asserting it against UTC/PW and by making false and misleading public statements in an attempt to interfere with contractual relations between UTC/PW and GE relating to the GP7200 and designed to thwart UTC/PW's manufacturing of fan blades for the GP7200 and prevent GP7200 sales.

147. As a result of Rolls-Royce's interference, UTC/PW has suffered and continues to suffer an actual loss, including but not limited to loss of goodwill, increased expenses and lost profits.

### Count 5 – Violation of § 43 of the Lanham Act

148. UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 129 of the Complaint.

149. As described in the incorporated paragraphs, Rolls-Royce made literally false and misleading statements of fact in commercial advertising and promotion about the GP7200 and GTF™ engine.

150. As described in the incorporated paragraphs, Rolls-Royce's false and misleading statements actually deceive or are likely to deceive a substantial number of customers for the GP7200 and GTF™ engine and other related companies in the industry.

151.  As described in the incorporated paragraphs, Rolls-Royce's false and misleading statements are material and are likely to influence purchasing and other decisions regarding the GP7200 and GTF™ engine.

152.  As described in the incorporated paragraphs, Rolls-Royce caused its false and misleading statements to enter interstate commerce.

153.  As described in the incorporated paragraphs, Rolls-Royce's false and misleading statements were made willfully and in bad faith.

154.  As described in the incorporated paragraphs, UTC/PW has suffered actual or probable injury as a result of Rolls-Royce's false and misleading statements.

### Count 6 – Declaratory Judgment that the Claims of the '077 Patent are Invalid

155.  UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 124 of the Complaint.

156.  The claims of the '077 Patent are invalid because they fail to comply with one or more of the statutory requirements for patentability set forth in 35 U.S.C. §§ 101 *et seq*.

157.  A judicial declaration of the invalidity of the '077 Patent claims is necessary and appropriate at this time pursuant to 28 U.S.C 2201(a) in order that UTC/PW may ascertain its rights and duties with respect to the '077 Patent.

### Count 7 – Declaratory Judgment that UTC/PW's Accused Engines and Fan Stages Do Not Infringe the Claims of the '077 Patent

158.  UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 124 of the Complaint.

159.  UTC/PW does not directly or indirectly infringe the claims of the '077 Patent because UTC/PW does not make, use, sell, offer to sell or import any system or method claimed in the '077 Patent and UTC/PW does not induce the direct infringement or contribute

to the direct infringement of any party that makes, uses, sells, offers to sell or imports any system or method claimed in the '077 Patent.

160.  A judicial declaration that UTC/PW does not directly or indirectly infringe the claims of '077 Patent is necessary and appropriate at this time pursuant to 28 U.S.C 2201(a) in order that UTC/PW may ascertain its rights and duties with respect to the '077 Patent.

### Count 8 – Declaratory Judgment that the '077 Patent is not Enforceable

161.  UTC/PW incorporates by reference the allegations contained in Paragraphs 1 through 124 of the Complaint.

162.  The claims of the '077 Patent are not enforceable because the individuals responsible for the prosecution of the '077 Patent intentionally deceived the United States Patent and Trademark Office by knowingly failing to disclose material prior art of which they were aware at the time of the '077 Patent's prosecution, and also for intentionally misleading the patent examiner with responses to office actions and claim amendments during prosecution of the '077 Patent.  These allegations are plead with particularity in Paragraphs 63 through 124 of the Complaint and are expressly and specifically incorporated herein.

163.  A judicial declaration that the '077 Patent is not enforceable is necessary and appropriate at this time pursuant to 28 U.S.C 2201(a) in order that UTC/PW may ascertain its rights and duties with respect to the '077 Patent.

### PRAYER FOR RELIEF

Wherefore, UTC/PW prays:

A.      That Rolls-Royce be permanently enjoined from engaging in any further violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.*, and also be enjoined from engaging in any further false statements and tortious interference

with UTC/PW's current or potential business relationships pursuant to the Lanham Act (15 U.S.C. § 1125) and Connecticut common law;

B.      That Rolls-Royce be required to pay actual damages (including UTC/PW's lost sales and/or Rolls-Royce's profits) and (where authorized by law) treble damages pursuant to, *inter alia*, the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g, and the Lanham Act (15 U.S.C. § 1125);

C.      That Rolls-Royce be required to pay punitive damages pursuant to the Connecticut Unfair Trade Practices Act and the common law of tortious interference;

D.      That UTC/PW be granted costs, including attorney fees (pursuant to, *inter alia*, Conn. Gen. Stat. § 42-110g(d) and Conn. Gen. Stat. § 35-34, 35), and interest, including but not limited to prejudgment and statutory interest pursuant to, *inter alia*, Conn. Gen Stat. § 37-3a, and all other expenses incurred in maintaining this action;

E.      That judgment be entered in UTC/PW's favor and against Rolls-Royce for a declaration that the claims of the '077 Patent are invalid;

F.      That judgment be entered in UTC/PW's favor and against Rolls-Royce for a declaration that UTC/PW does not directly or indirectly infringe the claims of the '077 Patent;

G.      That judgment be entered in UTC/PW's favor and against Rolls-Royce for a declaration that the '077 Patent is not enforceable; and

H.      That UTC/PW be granted such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff UTC/PW demands a trial by jury, pursuant to FED. R. CIV. P. 38, on all claims to which a right to jury trial exists under law.

September 27, 2010

_____

Craig A. Raabe (ct04116)
craabe@rc.com
Andrea Donovan Napp (ct26637)
anapp@rc.com
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  06103-3597
Telephone: 860-275-8304
Facsimile:  860-275-8299

Of Counsel:

Philip S. Beck
Mark L. Levine
Jason L. Peltz
Chris Lind
Michael J. Valaik
Paul J. Skiermont
Hamilton H. Hill
BARTLIT BECK HERMAN
     PALENCHAR & SCOTT LLP
54 West Hubbard St.
Chicago, IL 60654
Telephone: 312-494-4400
Facsimile:  312-494-4440

Counsel for Plaintiff
UNITED TECHNOLOGIES CORP.